**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5554-18
A-3894-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JEROME DAVIS, a/k/a
JEROME R. DAVIS,
and JEROME GLOVER,

     Defendant-Appellant.

_____

Argued (A-5554-18) and Submitted (A-3894-19)
October 30, 2023 – Decided November 20, 2023

Before Judges Mawla, Marczyk, and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment Nos. 17-07-0856, 17-07-0857, 18-07-1109, and 18-08-1225.

Robert Carter Pierce, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Robert Carter Pierce, on the briefs).

Erin M. Campbell, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex

County Prosecutor, attorney; Patrick F. Galdieri, II, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

These are back-to-back appeals. In A-5554-18, defendant Jerome Davis appeals from his convictions for: first-degree murder, N.J.S.A. 2C:11-3(a)(1), (count one); second-degree burglary, N.J.S.A. 2C:18-2, (count two); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), (count three); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1), (count four). He also challenges his sentence. In A-3894-19, defendant appeals from his conviction following a guilty plea to a certain persons offense, N.J.S.A. 2C:39-7(b)(1). We affirm.

Defendant's trial lasted twelve days. In addition to audio, video, and documentary evidence, the State adduced testimony of eighteen witnesses, including: defendant's ex-girlfriend Shaddia Booker; Middlesex County Prosecutor's Office lead detective David Abromaitis; Booker's friend Princetta Jarrett; an employee of Spy Shop, a retail company specializing in the sale of security equipment; an employee of a gas station; a manager of a carwash; and Booker's uncle, Curtis Booker, Sr.

Booker dated defendant for approximately seven years, between 2008 and 2015, and lived with him for three or four of those years. She testified the relationship was abusive, however, she remained with defendant.

When the relationship ended in 2015, Booker began dating other people, including the victim, Patrick Olarerin. Booker's relationship with Olarerin was not exclusive. She enjoyed socializing. Olarerin was much older, retired, and receiving disability. He was content spending time at home. Although this caused some friction in their relationship, as of 2017, Booker was living with Olarerin in his North Brunswick apartment. She planned to terminate the lease on a home she rented in Plainfield, which she once shared with defendant, and move in with Olarerin.

In February 2017, defendant began contacting Booker again. He sent her multiple text messages and called her multiple times per day, using different phone numbers. The messages, which were sometimes sexual in nature or referred to marriage, indicated defendant was back in town, wanted to resume his relationship with Booker, and wanted her to end the relationship with Olarerin. Booker would occasionally speak with defendant or respond to his messages, but she mostly ignored him.

A-5554-18

Defendant sent flowers to Booker's workplace and her sister's home, believing Booker lived there. Defendant contacted one of Booker's friends through Facebook. Booker testified she was "agitated" by defendant's phone calls and text messages. Although she loved him, she "didn't want to be in a relationship with him anymore." She spoke with and texted with him because she felt "sorry for him," "wanted him to get himself together," and encouraged him to "stay on his path."

In early March 2017, Booker and defendant met at her stepmother's house so he could obtain a key from her to retrieve his belongings from the Plainfield home. On another occasion in March, defendant stopped by Booker's sister's house, uninvited, and argued with Booker's mother, who was there visiting. Booker was also present on that date. She told defendant he "can't pop up at someone else's house," and she would "talk to him later." She kept putting him off because they "had a[n] abusive relationship so [she] was scared of him."

On April 3, 2017, Booker met defendant at a motor vehicle agency, so he could obtain a copy of the title to his truck, which had been in her name. They had dinner afterwards. On April 29, 2017, Booker met defendant at his apartment in Piscataway and they had sex. She testified that afterward she "felt like crap" and this was the last time they met. When she spoke with him later,

4

she told him that she "needed space," and to "[g]ive it time," "[g]ive it a year," and if he changed "[m]aybe we can see if maybe we can get back together."

However, defendant continued to text and call Booker. On May 4, 2017, he visited Spy Shop and purchased a GPS tracking device to track Booker's vehicle. Defendant told the salesperson "he had just gotten engaged or given his fiancé a large diamond ring," and he "wanted some reassurance about this investment that he made . . . ." Defendant stated he first had to "find his fiancé's car because he hadn't seen it in a while," and "he didn't know . . . what she was up to."

The salesperson installed the necessary software on defendant's phone, and explained how to use the GPS device, including how to access the tracking data on the company's website. Later that night, defendant communicated with the salesperson to troubleshoot the device. Defendant stated he had attached the GPS tracker to the vehicle but could not pinpoint the vehicle's current location. The salesperson testified the GPS tracking data showed the tracker was attached when it was parked at Booker's workplace in Somerset.

The following morning, defendant told the salesperson he had located the vehicle at an apartment complex nearby. The corresponding GPS data indicated the vehicle was parked in North Brunswick.

5

The next day, Booker received a text message from defendant, apparently intended for someone named "John," in which he recited the license plate number of a vehicle belonging to Olarerin, which Booker had been driving on May 4. That day, Booker drove to lunch with Olarerin to celebrate his birthday and then drove to work, where she had parked near Jarrett's vehicle.

On May 6, defendant texted Booker, saying he had run into Jarrett. Jarrett also called Booker about the same encounter. Jarrett testified that on one occasion in May 2017 she observed defendant driving near her home. She thought it was "strange and weird," and wondered what he was doing in her neighborhood. A few days later, defendant cut her off while she was driving with her son and forced her to stop. She asked defendant what he was doing and why he was following her. He looked surprised to see her and said something like "oh, I got the wrong person." Jarrett understood this to mean defendant thought he had intercepted Booker and Olarerin.

Booker informed Olarerin defendant was back in town and texting her, including the text she received bearing Olarerin's license plate number. Olarerin contacted a friend who worked as a North Brunswick police officer because she was concerned whether someone could obtain his address using a license plate number. The friend told Olarerin only a law enforcement officer, and the court

A-5554-18

could obtain this information and he "didn't think civilians could get that information just by having his license plate number."

The State presented evidence showing defendant continued to track Booker by checking the tracking website multiple times per day between May 4 and May 14, 2017. The tracker data showed the tracker traveled from North Brunswick to Piscataway on May 9 and made a return trip on May 12, evidencing defendant removed the tracker to re-charge it and replaced it on the vehicle. Booker testified she saw defendant as she walked out of Olarerin's apartment the morning of May 9. Defendant exited his vehicle and walked towards her. As she walked toward her car, she went "back and forth" with defendant, asking him why he was there. When she got into her car, she called Olarerin to let him know defendant was outside. She also answered her phone when defendant called her, to tell him she did not want him coming to her home.

After Booker left, defendant went to Olarerin's front door. The jury heard Olarerin's 9-1-1 call, during which he noted with alarm defendant had somehow entered the apartment. Defendant also called 9-1-1 and was heard telling Olarerin to "[l]eave my wife alone" and that he wanted Olarerin to "stop what he's doing."

7

A-5554-18

That evening, Booker and Olarerin went to the North Brunswick Police Department and Booker obtained a temporary restraining order (TRO) against defendant, which listed Olarerin as a protected party. According to the officer who met with the couple, Booker seemed "upset," "nervous," and "afraid." Olarerin seemed even "more scared than" Booker and appeared "nervous" and "shaken up about the entire incident."

Booker's uncle came to the police station that night. As he was leaving with Olarerin, he saw defendant in the parking lot. Their interaction was captured on surveillance video. He flagged down defendant and briefly met with him in a nearby Krauszer's parking lot. The uncle told defendant Booker had "moved on, . . . [and] didn't want to be bothered no more." He informed defendant Booker obtained a TRO. After the uncle told defendant he did not want to see him get into trouble and to "leave it alone[,]" defendant responded he still loved Booker and that Olarerin made her obtain the TRO.

The following day, Olarerin installed a camera inside his apartment facing the front door. When the camera detected motion, it sent alerts to Booker's phone.

Police served the TRO on defendant on May 12, 2017. However, defendant continued to call and text Booker notwithstanding the TRO.

On May 13, 2017, Booker went shopping and to a hair salon with Jarrett in preparation for a night out in Elizabeth. Defendant continued calling Booker. She answered a few of his calls, but only to tell him to stop contacting her. In the early morning hours of May 14, Jarrett picked up Booker at Olarerin's apartment, and they headed out. The home surveillance camera recorded Booker's departure, including her asking Olarerin not to chain the door because she intended to return. Olarerin locked the door after Booker left.

Defendant continued to call and text Booker. According to Jarrett, at some point, Booker spoke with defendant and appeared nervous and agitated. She advised him she was out. Defendant called Booker at 3:21 a.m., and did not call her again until 4:38 a.m. Defendant also checked the GPS tracker website at 3:26 a.m., but did not check it again until 8:51 a.m. In between that time, defendant's phone recorded the use of its flashlight for approximately seven minutes beginning at 3:36 a.m.

At 4:11 a.m., 4:12 a.m., and 4:13 a.m., Booker received notifications on her phone, indicating that the camera had detected movement inside Olarerin's apartment. She assumed Olarerin was leaving to walk his dog, which he did every day around 4:30 a.m. She tried to FaceTime him, but he did not answer,

9

so she assumed he had left his phone in the house. She did not check the surveillance video.

When Booker arrived home at approximately 5:14 a.m., she found Olarerin lying on the floor. He was cold, non-responsive, and bleeding from the head, and the dog was locked in its crate. His phone and wallet were five to ten feet away from his body. She could not recall whether the front door had been locked when she got home. She called 9-1-1 at 5:16 a.m. and stated the top lock to the front door was unlocked when she returned home.

When the police arrived, they observed no evidence of forced entry into the home and found no fingerprints on the front or back doors. However, they noted that the front door was "old" and "weathered" and "not very sturdy or stable." Olarerin was lying on his back, with his head touching the patio door, which was locked. He was pronounced dead at 6:04 a.m. The State's forensic pathologist testified the cause of death was an injury to the brain, caused by a gunshot to the left side of his head, which had no exit wound.

Booker showed police a videoclip from the security camera, which showed an unidentified man quietly walk into the apartment, wearing gloves, a mask, and a hoodie with the hood up, carrying a handgun between 4:11 and 4:13 a.m. Booker believed the man was defendant based on the fact he discovered

where she was living, the TRO, and subsequent text messages and phone calls. The police also spoke to Olarerin's police officer friend, who confirmed Olarerin was concerned defendant was attempting to locate his residence.

Police searched defendant's home and vehicle but did not find any clothing matching what the suspect wore in the surveillance video. Defendant's vehicle was a silver-grey Ford Explorer. Inside police found mail addressed to Booker; photographs of defendant and Booker; a post-it note with the GPS tracker website written on it; a business card for Spy Shop; receipts from businesses in North Brunswick, near Olarerin's apartment, with license plate numbers written on their backs; a copy of the TRO; and multiple pairs of gloves.

Police conducted a forensic search of two phones seized from defendant's person. They discovered the text messages between defendant and Booker; the messages and phone calls defendant made to Booker from other numbers; messages from defendant to Booker asking her to unblock his phone number; call forwarding applications, which allowed defendant to disguise his phone number and make calls from different numbers on the same phone; evidence defendant was blocking his number so his messages could go through to Booker's phone; images of Booker's vehicle and license plates, which were taken when he met her at the motor vehicle agency; a photo of Booker's sister's

11

residence; photos of vehicles parked near Booker's workplace; internet searches attempting to locate Booker, including multiple license plate searches of vehicles associated with Booker, Olarerin, Booker's friends, and vehicles parked near Booker's workplace; text messages indicating defendant's attempts to locate and track Booker; and the tracker application and evidence of defendant's use of the GPS tracker, including his messages to the Spy Shop salesperson.

After discovering the tracker application on defendant's phone, police searched Booker's vehicle and found the tracker under the back bumper. They also interviewed the Spy Shop salesperson about defendant's purchase and use of the tracker.

Police obtained surveillance videos from two businesses located at the interchange of Routes 1 and 18 for the early morning hours of May 14, 2017. The videos showed a light-colored truck, like defendant's, traveling in the direction of defendant's home and away from Olarerin's at 4:23 a.m., approximately ten minutes after Olarerin was killed.

On July 5, 2017, Detective Abromaitis received a handwritten letter, dated June 27, 2017, which was sent from the Middlesex County Adult Correctional Center (MCACC) bearing an inmate number "one number off" from defendant's

12

number.  Defendant's DNA was found on the envelope, and Booker testified she recognized the handwriting in the letter as belonging to defendant.

Detective Abromaitis testified the letter contained information that only the killer would know.  The letter suggested the murder had happened quickly, with no noise, and that Olarerin had been shot in the left side of the head.  The location of Olarerin's wound was not public knowledge at the time the detective received the letter, because police would not receive the medical examiner's report until July 19, 2017.

According to Detective Abromaitis, there was other evidence defendant wrote the letter.  The letter attempted to point police away from defendant by providing the names of two men who were listed as contacts in defendant's phone.  The writer misspelled the word cousin as "couison," which was the same way defendant misspelled the word in his phone contacts.  The letter referenced car auctions, an industry in which defendant had worked.  And the writer referenced one of the other men driving a black Mercedes-Benz like Booker's, and defendant's phone contained a photo of such a vehicle.

The jury convicted defendant on all charges.  The trial judge sentenced defendant to:  sixty-five years on count one, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2; and concurrent terms of ten years each on counts

13

two, three, and four. Count two was subject to NERA, and count three was subject to a five-year parole disqualifier pursuant to the Graves Act, N.J.S.A. 2C:43-6(c).

Separately, defendant was indicted on one charge of second-degree certain persons not to possess a firearm, N.J.S.A. 2C:39-7(b)(1), because he had previously been convicted of escape and robbery. Following defendant's conviction and sentencing on the offenses in A-5554-18, he pled guilty to the certain persons offense and to another offense in a third indictment, which is not a part of these appeals. Prior to entering the plea, defendant moved to dismiss the indictment. The motion was denied.

During the plea colloquy, defendant admitted that on May 14, 2017, he had constructive possession of the firearm found by the police during their search of defendant's home in Piscataway. Although defendant denied ownership of the firearm or having touched it, he testified he was keeping it for a friend who had been accused of domestic violence. Defendant admitted he knew he had prior convictions which precluded him from possessing a firearm. Defendant's plea reserved his right to appeal from the trial court's denial of his motion to dismiss.

The court sentenced defendant on the certain persons offense in accordance with the plea agreement to five years imprisonment with five years of parole ineligibility. The sentences ran concurrently with the murder sentence and the sentence on the third indictment.

In A-5554-18, defendant raises the following points:

POINT I   THE CONTENT OF [DEFENDANT'S] CONVERSATIONS WITH OTHER WOMEN WAS NOT OFFERED TO PROVE THE TRUTH OF THE MATTERS ASSERTED; THE TRIAL COURT'S EVIDENTIAL RULING THAT EXCLUDED THIS EVIDENCE DEPRIVED [DEFENDANT] OF A FAIR TRIAL. . . .

POINT II   THE ALLUSIONS TO [DEFENDANT] "GOING AWAY" AND "COMING BACK" INVITED PREJUDICIAL SPECULATION THAT [HE] WAS IN PRISON FOR THE DOMESTIC ABUSE OF BOOKER. . . .

POINT III   THE REFERENCES TO DOMESTIC VIOLENCE AND THE RESTRAINING ORDER WERE PREJUDICIAL, AND THE JUDICIAL RESPONSE IN THE FORM OF JURY INSTRUCTIONS WERE INADEQUATE. . . .

POINT IV   THE SURVEILLANCE VIDEOS WERE NOT PROPERLY ADMITTED INTO EVIDENCE AND IT WAS IMPROPER FOR DETECTIVE ABROMAITIS TO TELL THE JURORS WHAT THEY WERE VIEWING. . . .

POINT V   DETECTIVE ABROMAITIS OPINED WHO COULD OR COULD NOT BE THE KILLER,

15

WHICH DEPRIVED [DEFENDANT] OF A FAIR TRIAL BECAUSE THE TESTIMONY INFRINGED UPON THE ULTIMATE QUESTION FOR THE JURY.  (Not [r]aised [b]elow)[.]

POINT VI WITHOUT COMPETENT EVIDENCE THAT [DEFENDANT] WROTE THE LETTER AND/OR ADDRESSED THE ENVELOPE, THE EVIDENCE WAS NOT PROBATIVE AND IF ANYTHING SERVED ONLY TO CONFUSE THE JURORS. . . .

POINT VII THE TRIAL COURT'S REVERSAL ON ITS EARLIER DISCOVERY RULINGS IMPAIRED [DEFENDANT'S] ABILITY TO DEFEND HIMSELF. . . .

POINT VIII  THE STATE FAILED TO PRESENT EVIDENCE THAT [DEFENDANT] DID NOT HAVE A PERMIT TO POSSESS A FIREARM, THEREFORE THE CONVICTION MUST BE VACATED.  (Not raised below).

POINT IX THIS COURT SHOULD CONSIDER ACQUITTING [DEFENDANT], OR GRANTING HIM A NEW TRIAL.  (Not raised below).

. . . .

POINT X   THE INDICTMENT WAS IMPROPERLY PROCURED AND SHOULD HAVE BEEN DISMISSED. . . . (Sub-Point A was not raised below.)

A. THE GRAND JURY WAS PERMITTED TO BASE THE CHARGES ON A FIREARM WHICH THE PROSECUTION DELIBERATELY

16

SHIELDED FROM THE PETIT JURY. (Not raised below)[.]

B. THE PROSECUTION MISREPRESENTED TO THE GRAND JURY THAT [DEFENDANT'S] CELL PHONES WERE EQUIPPED WITH AN APP THAT TRANSFERRED HIS PHONE CALLS FROM ONE DEVICE TO THE OTHER.

POINT XI [DEFENDANT'S] SENTENCE WAS MANIFESTLY EXCESSIVE BECAUSE THE TRIAL COURT BASED THE SENTENCE ON PENDING CRIMINAL CHARGES AS WELL AS DOUBLE-COUNTING AGGRAVATING FACTORS. . . .

In his pro se brief, defendant raises the following points:

POINT I [DEFENDANT] WAS DEPRIVED [OF] HIS RIGHT TO A JURY TRIAL BECAUSE THE TRIAL COURT SHOULD HAVE ADDRESSED THE ISSUE WITH JUROR NUMBER ELEVEN INSTEAD OF TRICKING HIM (AS WELL AS THE REST OF THE JURORS) INTO BELIEVING THE JUROR/ALTERNATE SELECTION WAS RANDOM. (Not raised below)[.]

POINT II THE INDICTMENT SHOULD HAVE BEEN DISMISSED FOR FAILURE OF THE PROSECUTOR TO PRESENT EXCULPATORY EVIDENCE TO THE GRAND JURY WHICH DIRECTLY NEGATES GUILT OF THE ACCUSED IN VIOLATION OF [THE] 5TH AND 14TH [AMENDMENTS] TO THE U[.]S[.] CONSTITUTION[.] (N[ot raised below])[.] . . .

In A-3894-19, defendant raises the following points:

17

POINT I    THE INDICTMENT WAS IMPROPERLY PROCURED AND SHOULD HAVE BEEN DISMISSED. ( . . . Sub-Points A and B were not raised below)[.]

A. THE GRAND JURY WAS PERMITTED TO BASE THE CHARGE ON A NON-SPECIFIC FIREARM. (Not [r]aised [b]elow)[.]

B. THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CHARGE OF CERTAIN PERSONS NOT TO POSSESS FIREARMS. (Not [r]aised [b]elow)[.]

I.

In both appeals, defendant challenges the grand jury proceedings leading to his indictments. In A-5554-18, he asserts the State presented evidence of the handgun seized from his home to substantiate the firearms charges, even though the handgun could not be tied to the murder, and the gun was not presented at trial. Defendant argues the State incorrectly claimed he used an application to forward calls from the phones at his home to a phone found in his vehicle. He contends the surveillance footage from the carwash was exculpatory and wrongfully withheld from the grand jury, because it captured a vehicle like his at 4:10 a.m., which given the distance and direction of travel, made it impossible for him to have committed the murder between 4:11 and 4:13 a.m.

18

In A-3894-19, defendant contends his certain persons conviction should be reversed because: (1) the grand jury indicted him for possessing the firearm used to murder Olarerin in North Brunswick, yet he pled guilty to possessing the firearm at his home in Piscataway; and (2) there was insufficient evidence presented to the grand jury to support the certain persons charge with respect to the firearm because the evidence did not show he had constructive possession.

Detective Abromaitis testified before the grand jury. He explained Booker's relationship with defendant, and defendant's conduct after she began seeing Olarerin. He also testified about the May 9, 2017 confrontation with Olarerin resulting in the TRO, service of the TRO on defendant two days before the murder, Olarerin's installation of a security camera, and Olarerin contacting his police officer friend.

Detective Abromaitis testified about Booker's communications with defendant the night of the murder, the discovery of Olarerin's body, the autopsy, and his review of the security camera footage. He told the grand jury about the police investigation, including an interview of defendant during which he claimed he was home alone the night of the murder. The detective testified about the search of defendant's home and discovery of a handgun underneath a deck, which did not belong to the owner of the home. He told the jury the gun

could not be tied to the murder of Olarerin because the bullet recovered from his body was damaged.

The detective's testimony also covered the search of defendant's vehicle, which produced two phones separate from the two phones seized from defendant's person. One of the phones found in the vehicle was an iPhone that had a forwarding application enabling calls coming into or from the phones taken from defendant's person to be forwarded to the iPhone. He explained the search of the phones taken from defendant's person showed one phone was being used to monitor a tracking device defendant had recently purchased from Spy Shop and attached to Booker's vehicle.

Detective Abromaitis testified the surveillance footage from the interchange showed a vehicle resembling defendant's traveling northbound on Route 1, turning onto the ramp of Route 18 North, towards defendant's home, within eight to ten minutes of the homicide. Police also interviewed defendant's friend and housemate, who said defendant always talked about Booker. The friend said defendant professed his love for Booker and wanted to marry her and be with her.

Detective Abromaitis testified about the letter received from the MCACC. He explained police investigated the other men mentioned in the letter, but the investigation yielded no leads.

Defendant moved to dismiss the indictment prior to trial. He claimed the State related incorrect testimony about the iPhone found in his vehicle because further investigation after the grand jury presentation showed the iPhone belonged to someone other than defendant, had no cellular service and could not accept calls forwarded from defendant's other phones. The other arguments defendant now raises regarding the gun and surveillance video were not made in the trial court.

The trial judge denied the motion, finding the information regarding the application on the iPhone did not unduly prejudice the grand jury because it was not "the main thrust of the State's case in terms of its proofs. It seemed to be more of a . . . side issue." The judge found the evidence part and parcel of the State's efforts "to present a complete picture of everything the State had."

At trial, the State did not introduce any evidence about the gun because it could not prove it was the murder weapon. With respect to the iPhone, counsel argued about the extent of permissible testimony on this issue and whether defense questioning of a State's witness about the phone would open the door to

questioning by the State as to the iPhone's owner, namely, a neighbor of Jarrett's, and how defendant acquired it. However, ultimately the State's questioning of Detective Abromaitis focused on the State's changing understanding of the role the phone played after the case had been presented to the grand jury.

A "grand jury must be presented with sufficient evidence to justify the issuance of an indictment." State v. Morrison, 188 N.J. 2, 12 (2006). However, "[a]t the grand jury stage, the State is not required to present enough evidence to sustain a conviction." State v. Feliciano, 224 N.J. 351, 380 (2016). The grand jury is an accusatory rather than an adjudicative body, and it determines only whether probable cause exists to believe that a crime has been committed. State v. Bell, 241 N.J. 552, 559 (2020). All that is required is for the prosecutor to present "some evidence establishing each element of the crime to make out a prima facie case." Morrison, 188 N.J. at 12. "The quantum of this evidence . . . need not be great." State v. Schenkolewski, 301 N.J. Super. 115, 137 (App. Div. 1997).

"[I]n reviewing the grand jury record on a motion to dismiss an indictment, the trial court should use a standard similar to that applicable in a motion for a judgment of acquittal at trial" under Rule 3:18-1. Morrison, 188 N.J. at 13. "The court should evaluate whether, viewing the evidence and the

rational inferences drawn from that evidence in the light most favorable to the State, a grand jury could reasonably believe that a crime occurred and that the defendant committed it." Ibid. Accord Feliciano, 224 N.J. at 380-81.

"An indictment is presumed valid and should only be dismissed if it is 'manifestly deficient or palpably defective.'" Feliciano, 224 N.J. at 380 (quoting State v. Hogan, 144 N.J. 216, 228-29 (1996)). For example, dismissal may be appropriate where a "deficiency in the proceedings affect[ed] the grand jurors' ability to make an informed decision whether to indict." Hogan, 144 N.J. at 229. Ultimately, however, "the decision whether to dismiss an indictment lies within the discretion of the trial court, . . . and that exercise of discretionary authority ordinarily will not be disturbed on appeal unless it has been clearly abused." Ibid. (citations omitted). Accord State v. Derry, 250 N.J. 611, 626 (2022); Bell, 241 N.J. at 561; State v. Saavedra, 222 N.J. 39, 55-56 (2015).

Pursuant to these principles, we conclude defendant's motion to dismiss the indictment was correctly decided. The evidence presented to the grand jury supported the charges on which defendant was indicted. As the trial judge found, Detective Abromaitis's incorrect testimony about the iPhone was not significant to those charges and did not undermine the validity of the indictment.

The other arguments defendant asserts warrant dismissal of the indictment were not raised before the trial court. Regardless, we address them for the sake of completeness.

Detective Abromaitis's grand jury testimony about the gun was accurate and not misleading. His testimony about the surveillance video was not exculpatory. To the contrary, the surveillance video supported a conclusion that defendant committed the murder because it suggested that defendant was driving away from the murder scene, in the direction of his home, shortly after the murder was committed. More importantly, Detective Abromaitis was questioned about the video at trial. Therefore, the issues defendant raises about the evidence presented to the grand jury are not grounds to reverse, given defendant's subsequent conviction on the far greater evidence presented to the jury at trial. State v. Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994).

Neither the certain persons indictment nor the grand jury proceedings preceding it were defective to warrant reversal of defendant's conviction. At the outset, we note defendant never moved to dismiss the certain persons indictment.

Regardless, the grand jury that considered the murder charge heard evidence defendant possessed a handgun, which he took to Olarerin's home and

24

used to kill him. Although the grand jury learned police found a gun in defendant's home, and the homeowner said it did not belong to him, it also knew police could not establish the gun found was the murder weapon.

With respect to the certain persons indictment, the same grand jury heard evidence that defendant was convicted of escape in 1999, and armed robbery in 2017. As a result of these convictions, it learned he was a person prohibited from having a firearm, yet he possessed a firearm to kill Olarerin on May 14, 2017.

This evidence was sufficient to support defendant's indictment on the certain persons charge. Indeed, "[t]he elements of the certain persons offense are straightforward: conviction of a predicate offense and possession of a firearm." State v. Bailey, 231 N.J. 474, 488 (2018) (citing N.J.S.A. 2C:39-7(b)(1)). It did not matter whether defendant possessed the gun in North Brunswick or whether it was the murder weapon; possession in Piscataway was enough to indict.

Defendant's argument the indictment was improperly amended prior to his guilty plea lacks merit. The record shows defendant consented to the amended indictment to alter the location of defendant's certain persons offense from North Brunswick to Piscataway, where the gun was found. This was consistent with

Rule 3:7-4, which permits the court to amend an indictment "to correct an error in . . . the description of the crime intended to be charged . . . provided that the amendment does not charge another or different offense from that alleged[,] and the defendant will not be prejudiced thereby in [their] defense on the merits." The amendment merely revised the description of the crime and did not substantively alter the offense with which defendant was charged, nor did it prejudice the ability to mount a defense in any way.

The plea colloquy also confirms defendant was not prejudiced by the amendment because he clearly understood the nature of the certain persons charge, including possession. Defendant gave detailed testimony recounting the gun belonged to a corrections officer friend who had been involved in a domestic violence incident. The friend left the gun in defendant's possession for a period of years. While defendant was incarcerated, he arranged for a different friend to hold the gun. When defendant was released, the gun's owner asked for the gun back, and defendant arranged for the gun to be left at his home in Piscataway, where it was found by the police before defendant had an opportunity to return it to the owner. Although defendant denied touching the gun, he admitted constructive possession by having it in his home and further stated he knew he was not legally permitted to possess the weapon.

## II.

Defendant contends the trial judge initially allowed him to review discovery during his pre-trial detention, but then reversed herself, which deprived him of the ability to aid his attorney in preparing a defense and of a fair trial. We are unpersuaded.

On September 19, 2017, approximately eighteen months before trial, the court entered an order permitting defendant to view thirty-two discs of discovery. In December 2017 and January 2018, the court held pre-trial hearings to address, among other things, defendant's complaints about access to discovery. At the time, defendant was housed in South Woods State Prison. There were technical difficulties in accessing the discovery due to the format in which it had been produced by the State.

As of March 2018, defendant was moved to the MCACC. On July 26, 2018, the court ordered the MCACC permit defendant "additional time throughout the week to view his digital discovery." In September 2018, defense counsel moved to enforce the July order. Middlesex County opposed the motion arguing the court lacked jurisdiction to order the MCACC to let defendant review the electronic discovery. Substantively, the county argued: there was a program available to inmates to review electronic discovery; defendant had

declined numerous opportunities to participate in the program; when defendant participated in the program, he had not utilized all the time available to him; and the program was intended to supplement, rather than replace, defendant's meetings with defense counsel. The court denied defendant's motion on jurisdictional grounds.

During the pretrial conference, defendant refused to sign the pretrial memorandum because he had not had an opportunity to review all the discovery. The pretrial memorandum noted discovery was complete, and the trial judge noted that pretrial motions regarding discovery had been made, discovery issues had been reviewed on the record, and multiple opportunities had been provided to defendant to review discovery. Defense counsel agreed with the court's assessment and stated he would "spend the entire . . . next week at the jail with [defendant] making sure he . . . reviews everything."

"In New Jersey, an accused has a right to broad discovery after the return of an indictment in a criminal case." State v. Hernandez, 225 N.J. 451, 461 (2016). The trial court's "power to order discovery is not limited to the express terms of the automatic discovery provisions of Rule 3:13-3(b)." State v. Richardson, 452 N.J. Super. 124, 132 (App. Div. 2017). "[C]ourts have 'the inherent power to order discovery when justice so requires.'" Ibid. (quoting

State in Int. of A.B., 219 N.J. 542, 555 (2014)).  However, the right to discovery "is not unlimited."  Hernandez, 225 N.J. at 463.

We are unconvinced there was a discovery violation here.  The record shows defendant had ample access to the discovery and the opportunity to review it with his attorney.  The trial judge correctly found she could not compel the MCACC to grant defendant access to the discovery in the manner he wished.  Moreover, he did not take full advantage of the MCACC's process enabling him to review the discovery.  These facts do not establish defendant was prejudiced or had an unfair trial warranting a reversal of his convictions.

III.

Defendant raises several evidentiary arguments on appeal.  We afford substantial deference to a trial court's evidentiary rulings.  State v. Morton, 155 N.J. 383, 453 (1998).  As a result, we review evidentiary rulings for an abuse of discretion.  Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371-72 (2011).  The trial court's evidentiary rulings must be upheld, "unless it can be shown . . . that its finding was so wide of the mark that a manifest denial of justice resulted."  State v. Carter, 91 N.J. 86, 106 (1982).

A.

Defendant sought to admit text messages from his phone, showing he had romantic relationships with women other than Booker as proof he was not obsessed with her and lacked a motive to kill Olarerin. He did not intend to call any of these women as witnesses, but instead intended to introduce the messages into evidence through the State's witness who extracted the data from his phones. The State objected on hearsay grounds.

The trial judge ruled the texts were inadmissible hearsay because they were being used to prove the truth of their contents, namely, that defendant had romantic relationships with other women. Further, a State's witness was not the means by which to admit the evidence, because they extracted the messages but did not send or receive them. The judge ruled to be admissible, the evidence would require testimony from the individuals who sent or received the text messages, who could testify from their personal knowledge about their relationships with defendant and their communications with him. Defendant never produced these witnesses.

The court's ruling that defendant's text messages with other women constituted hearsay under N.J.R.E. 801(c) was sound, and we reject defendant's arguments to the contrary. As required by N.J.R.E. 602, defendant had to

30

present testimony from someone with personal knowledge of these relationships; a police witness who extracted the messages or reviewed them did not suffice.[1]

B.

Before trial, the State moved to admit evidence of a threat defendant made to Olarerin on May 9, 2017, and the TRO issued on that date. The trial judge issued a written opinion analyzing the evidence under N.J.R.E. 404(b) and State v. Cofield, 127 N.J. 328 (1992), and granted the State's motion in part.

The judge found the threat to kill Olarerin was admissible intrinsic evidence under N.J.R.E. 401, 402, and 403. She also ruled the evidence of the May 9, 2017 threat was admissible under N.J.R.E. 404(b), subject to a limiting instruction. However, the State could not refer to the TRO. The judge concluded the "court will sanitize any and all reference to the issuing and violation of the victims' restraining order against . . . defendant as it is unduly prejudicial."

During a later pretrial hearing, the State sought additional guidance from the court as to how the TRO could be sanitized. It asked the court to revisit the

---

[1] Notwithstanding the evidentiary ruling, the jury learned during the defense cross-examination of Detective Abromaitis that defendant had a relationship with another woman.

31

issue because defendant was served with the TRO approximately thirty hours before the murder, the TRO was found in defendant's vehicle, along with engagement and wedding rings, and the State intended to tell the jury the TRO was "the final straw" leading defendant to murder Olarerin.

At a later pretrial hearing the judge stated she realized the "heightened relevance" of the TRO, given defendant's knowledge of the TRO, and the timing of its service on defendant. Over defense counsel's objection, the judge stated she would "be taking a look at that and how these issues interplay" and whether it could "disturb [her] initial ruling."

On the first day of trial, the judge ruled the parties would be permitted to use the phrase "restraining order." She noted defense counsel agreed. The judge concluded the TRO was "highly probative and relevant to the issues of motive and plan and identification and so intertwined with the . . . facts of the case and intrinsic to the facts of the case that it is important that it be able to be brought up." Rather than instructing the jury during opening statements, she would instead give the limiting "instruction when the evidence comes in through testimony."

Although the defense consented to the State using the term restraining order, defense counsel objected during the State's opening when it mentioned

the May 9, 2017 incident and Booker obtaining a restraining order against defendant. The issue arose again with the State's first witness, a North Brunswick Police patrolman who spoke with Booker at the crime scene and asked whether she could identify the man in the home surveillance video. He testified Booker mentioned defendant, and "a few incidents between him and the deceased" and "two prior reports [of] harassment" at which point defense counsel objected. The judge instructed the jury to disregard the witness's statement and permitted the State to lead the witness to avoid further problems.

After the witness concluded his testimony, defense counsel moved for a mistrial. The judge denied the motion, noting the court and counsel would be "revisiting the issue of the prior domestic violence and the restraining order," the jury would hear testimony about the May 9, 2017 incident, and the court would be issuing a limiting instruction.

Before Booker testified, the trial judge discussed use of the phrase "restraining order." The parties agreed the phrase would be used in the context of what occurred on May 9, 2017, and Booker would be permitted to generally reference an "abusive relationship." However, she could not go into details about any allegations of past abuse, and the TRO would not be admitted into evidence.

Booker testified her relationship with defendant was abusive, and the jury heard about the May 9, 2017 incident and the TRO. After the first mention of the restraining order, the judge issued the following instruction:

> Ladies and gentlemen, the State has introduced evidence of a [TRO] barring defendant from having contact with . . . Booker. A [TRO] as opposed to a final restraining order [(FRO)] can be obtained with a one-sided complaint in summary fashion.
>
> Our rules of evidence specifically exclude evidence that . . . if a defendant has committed any other crimes, wrongs, or acts when it is offered to show only that he has a disposition or a tendency to do wrong and therefore must be guilty of the charged offenses.
>
> Before you can give any weight to this evidence, you must be satisfied that the defendant committed . . . this other act. If you are not so satisfied, you may not consider it for any purpose.
>
> However, our rules do permit evidence of other crimes, wrongs, or acts when the evidence is used for . . . [a] certain specific, narrow purpose.
>
> In this case, the evidence is only to be considered by you, members of the jury, to prove . . . defendant's motive, intent, plan, or identification. The State has introduced evidence of the [TRO] to show that it was this defendant's motive, intent, or plan to commit the crimes charged.
>
> Whether this evidence does, in fact, demonstrate motive, intent, or plan is for you to decide. You may decide that this evidence does not demonstrate motive, intent, or plan and is not helpful to you at all. In that

34

case, you just disregard this evidence. On the other hand, you may decide that this evidence does demonstrate motive, intent, or plan and use it for one or more of those specific purposes.

However, you may not use this evidence to decide that . . . defendant has a tendency to commit crimes or that he is a bad person. That is, you may not decide that just because . . . defendant may have committed another crime, wrong, or bad act, he must be guilty of the present crimes.

I have admitted this evidence only to help you to decide this specific question of whether the issuance of the [TRO] motivated . . . defendant to commit the crimes alleged. You may not consider it for any other purpose and may not find . . . defendant guilty now simply because the State offered evidence that he committed other crimes, wrongs, or acts.

During summations, the State referenced the restraining order in the context of defendant's unrestrained obsession with Booker, evidenced by following Booker and Olarerin to the police station and then returning to Olarerin's home and photographing his vehicle notwithstanding the TRO. Defense counsel objected to the State's use of the phrase "restraining order" because he thought the parties "had come to terms that we were calling it a TRO," but counsel did not ask the court for a curative or limiting instruction.

35

Following summations, the court's final jury charge instructed the jury that counsel's statements did not constitute evidence. The judge also reiterated the limiting instruction about the restraining order.

The admissibility of evidence under N.J.R.E. 404(b) is viewed restrictively, as a rule of exclusion rather than inclusion. State v. Willis, 225 N.J. 85, 100 (2016). The trial court determines whether the evidence concerns prior bad acts, under N.J.R.E. 404(b), or is intrinsic to the charged offense, and therefore relevant under the N.J.R.E. 403 balancing test. State v. Rose, 206 N.J. 141, 179 (2011). It is "more likely that evidence of uncharged misconduct will be admitted . . . if it is considered intrinsic to the charged crime and subject only to [N.J.R.E.] 403 than if it is not considered intrinsic evidence and subject to both [N.J.R.E.] 404(b) and [N.J.R.E.] 403." Id. at 178. Intrinsic evidence "directly proves" the crime charged or if the other wrongs or bad acts in question were performed contemporaneously with, and facilitated, the commission of the charged crime. Id. at 180 (quoting U.S. v. Green, 617 F.3d 233, 248-49 (3d Cir. 2010)).

The trial court must consider whether the evidence is: "relevant to a material issue; . . . similar in kind and reasonably close in time to the offense charged; . . . clear and convincing;" and if "[t]he probative value . . . outweigh[s

the] . . . prejudice." Cofield, 127 N.J. at 338 (quoting Abraham P. Ordover, Balancing the Presumption of Guilt & Innocence: Rules 404(b), 608(b), & 609(a), 38 Emory L.J. 135, 160 (1989) (footnote omitted)).

In performing its analysis under prong four, the court must consider whether the other-crimes evidence is necessary to prove the fact in dispute or whether other, less prejudicial evidence could be used to prove the same fact. State v. Stevens, 115 N.J. 289, 303 (1989). "Nevertheless, some types of evidence, such as evidence of motive or intent, 'require a very strong showing of prejudice to justify exclusion.'" State v. Green, 236 N.J. 71, 84 (2018) (quoting State v. Garrison, 228 N.J. 182, 197 (2017)). Accord State v. Castagna, 400 N.J. Super. 164, 180 (App. Div. 2008) ("greater leeway is given when the evidence is proffered on the issue of motive").

Where other bad acts evidence is deemed admissible, the trial court should sanitize the evidence if appropriate, and issue a limiting instruction to the jury, both when the evidence is admitted and in the final charge. Green, 236 N.J. at 84. "[T]he court must not only caution against a consideration of [N.J.R.E. 404(b)] evidence for improper purposes, it must through specific instruction direct and focus the jury's attention on the permissible purposes for which the evidence is to be considered." State v. G.S., 145 N.J. 460, 472 (1996).

37

The trial judge carefully considered the N.J.R.E. 404(b) evidence and concluded the State met the Cofield factors for admissibility. The TRO was clearly intrinsic to the crimes charged, and it was impossible for the State to present its case without referencing the May 9, 2017 incident and the fact Booker obtained a restraining order against defendant.

The probative value outweighed the prejudice to defendant because this evidence helped prove defendant's motive and intent. We have upheld the admission of restraining order and domestic violence evidence in similar circumstances. See Castagna, 400 N.J. Super. at 178-86 (holding that restraining order evidence was admissible as to the defendant's motive to kill victim); State v. Amodio, 390 N.J. Super. 313, 329-31 (App. Div. 2007) (finding restraining order evidence admissible as to motive, and no error in court's limiting instruction). Cf. State v. Nance, 148 N.J. 376, 387-90 (1997) (holding that evidence of the defendant's jealousy was relevant and admissible to prove motive for murder); State v. Vargas, 463 N.J. Super. 598, 604, 607-18 (App. Div. 2020) (holding that the defendant's prior threat that "if you can't be with me, then you can't be with anyone," was admissible under N.J.R.E. 404(b) as relevant to his state of mind, motive and intent to kill victim); State v. Baluch, 341 N.J. Super. 141, 191-93 (App. Div. 2001) (finding evidence of past domestic

abuse of victim was relevant to establish motive, intent, and state of mind to harm victim and negate defense theory); State v. Angoy, 329 N.J. Super. 79, 85-88 (App. Div. 2000) (finding no error in admitting evidence of the defendant's prior assault of victim/girlfriend, in trial for her murder); State v. Engel, 249 N.J. Super. 336, 372-74 (App. Div. 1991) (holding that evidence of the defendant's prior acts of violence and threats against victim was properly admitted on issue of motive).

The restraining order evidence was "prejudicial in the way that all highly probative evidence is prejudicial: because it tends to prove a material issue in dispute." Rose, 206 N.J. at 164. However, it was not "unfairly prejudicial," because it did not "create[] a significant likelihood that the jury would convict defendant on the basis of the uncharged misconduct because he was a bad person, and not on the basis of the actual evidence adduced against him." Ibid.

The trial judge's limiting instruction was timely, correct, and adequately instructed the jury on the limited use of the restraining order evidence. "[W]e trust juries to follow instructions." State v. Short, 131 N.J. 47, 65 (1993). The record does not convince us the jury failed to follow the judge's instructions.

C.

Defendant argues the trial judge committed reversible error by permitting the State to introduce the surveillance videos into evidence without proper authentication. He argues Detective Abromaitis could not authenticate the videos. Furthermore, the detective was allowed to narrate the videos for the jury. Regardless, he asserts the videos were exculpatory because the time stamps on the clips shown to the jury prove he could not have committed the murder and be on the surveillance videos at the same time.

During a pre-trial hearing, the judge ruled videos from the businesses near the Routes 1 and 18 interchange were "highly relevant" because they showed a vehicle fitting the description of defendant's traveling what "would be a direct route between the" murder scene and defendant's home. At trial, the State presented testimony from the gas station employee whose station was at the interchange. He testified the gas station had cameras recording twenty-four hours per day, and the footage was from his station's cameras. He explained the time stamp on the video was off by one hour because of daylight savings time. Over defense counsel's objection, the trial judge found the employee had authenticated the video.

The State further adduced testimony from the manager of a carwash also located in the interchange. He likewise explained the business's practice of operating cameras and authenticated the video, also explaining a time stamp discrepancy due to daylight savings. Notably, he was shown a clip bearing a time stamp of 4:10 a.m. The trial judge ruled the witness authenticated the video over the defense's objection.

The State offered Detective Abromaitis's testimony after the videos were authenticated. He told the jury police identified a vehicle fitting the description of defendant's driving past the businesses toward defendant's home, "which is right off of Route 18 . . . in Piscataway about ten minutes after the suspect is seen leaving" Olarerin's home. The defense did not object to this testimony. An objection only came when the detective began to describe the car, and the judge sustained the objection mid-sentence before the detective could articulate an opinion regarding what the video depicted.

Under N.J.R.E. 901, to satisfy "the requirement of authenticating or identifying an item of evidence, the proponent must present evidence sufficient to support a finding that the item is what its proponent claims." This rule does not require "absolute certainty or conclusive proof." State v. Mays, 321 N.J. Super. 619, 628 (App. Div. 1999). Courts generally play the role of screener,

41

leaving to the jury a more intense review of the evidence. <u>Konop v. Rosen</u>, 425 N.J. Super. 391, 411 (App. Div. 2012).

Pursuant to these principles, we have no difficulty concluding the videos were properly authenticated by the gas station employee and the carwash manager. Defendant's arguments to the contrary lack merit.

Further, the evidence showed the murder was committed between 4:11 and 4:13 a.m. The carwash manager was shown a clip from 4:10 a.m., but not for purposes of explaining that defendant's car was depicted in frame. That task was left to Detective Abromaitis, who testified the vehicle appeared in the frame at 4:23 a.m., which made it entirely feasible for defendant to commit the murder and later be seen driving by the interchange.

Defendant's argument Detective Abromaitis was permitted to narrate the video lacks merit. Our Supreme Court recently stated "an investigator who has carefully reviewed a video recording can . . . offer lay witness testimony. By drawing attention to key details that a jury might otherwise overlook—as is the case, for example, with a potentially confusing, complex, or unclear recording— such evidence can be particularly helpful." <u>State v. Watson</u>, 254 N.J. 558, 569 (2023). However, "the rules of evidence do not allow for continuous, running commentary on video evidence by someone who has merely studied a

42

recording." Ibid. As we noted, there was no such improper narration here. The detective's testimony was cut short, and there was no "continuous, running commentary" of the sort disapproved in Watson.

D.

Defendant asserts Detective Abromaitis offered an improper opinion about who the killer was, which usurped the jury's factfinding role and deprived him of a fair trial. He claims the inadmissible opinion testimony came in the form of the detective's statements regarding the suspects who were ruled out, and that all evidence pointed to defendant.

Defendant's assertion the State elicited testimony regarding the ruling out of other suspects is unsupported by the record. Booker identified defendant as a suspect in Olarerin's murder from the start of the investigation, and the police investigation uncovered evidence supporting defendant's guilt. The evidence of other possible suspects was adduced during the defense's cross-examination of Detective Abromaitis to raise doubt about the thoroughness of the police investigation. Indeed, the defense asked the detective whether a third party might have been responsible for Olarerin's death, noting Booker's relationships with men other than Olarerin, as well as Olarerin's business dealings. This prompted the State to rebut those defense theories by questioning Detective

Abromaitis about the extent of the police investigation, including Booker's other relationships and Olarerin's business and finances. Detective Abromaitis then told the jury the other men were ruled out because: Booker and one of her male friends were in Elizabeth at the time of the murder; another of Booker's male friends had been involved with her in 2015/2016, when she was living in Plainfield, and had not been in contact with her in 2017; and the police found a third male friend's communications with Booker failed to show he had any issue with Olarerin.

Notably, the defense did not object to this testimony. We decline to find it was reversible error considering it was invited by the defense. See State v. Kemp, 195 N.J. 136, 155-56 (2008) (finding the doctrine of invited error barred the defendant from contesting on appeal testimony he agreed to at trial).

Defendant argues the following colloquy between the State and Detective Abromaitis during the redirect testimony constituted reversible error: "[Prosecutor]: Okay. And when you continue[d] with your investigation what did you find when you continued to look into [defendant]'s phone? [Detective Abromaitis]: Again, all signs and facts pointed toward [defendant] committing this murder."

For strategic reasons, defense counsel waited until the detective was off the witness stand to object, because the defense did not believe the prosecutor intentionally elicited the testimony, and the defense did not want to highlight it. The judge responded she would have sustained the objection if it was timely made and instructed the jury that it, not the detective, was to decide guilt. The judge and counsel agreed she would instruct the jury accordingly, and after a brief charge conference and before the jury left for the day, the judge gave the following instruction:

> One other instruction I need to give you is, that the decision . . . of whether the State has proven . . . defendant guilty beyond a reasonable doubt is your decision. And the opinions that may have been given by any particular witness in this case as to whether the State and whether the evidence points in a particular direction is not something that you would consider. It is your decision as to whether . . . defendant has [been] proven guilt[y] beyond a reasonable doubt.

In the final charge, the judge repeated this instruction and instructed the jury on third-party guilt.

There is no doubt police are not permitted to opine on a defendant's guilt, which is the ultimate question for the jury to decide. State v. Frisby, 174 N.J. 583, 593-94 (2002). However, we are unconvinced the detective's testimony here constituted reversible error. At the outset, we note the problematic

testimony came in on re-direct and followed testimony the defense elicited regarding why the State ruled out certain individuals. Moreover, the judge instructed the jury following the detective's testimony and again at the end of the case about its factfinding role, which cured any prejudice created by the redirect testimony.

E.

Defendant contends the trial judge erred by admitting the letter Detective Abromaitis received from the MCACC, because the State presented no competent evidence defendant wrote the letter or addressed the envelope. The judge also erred in permitting Booker to testify she recognized defendant's handwriting.

Prior to trial the judge ordered defendant to provide a buccal swab and a handwriting exemplar. When defendant objected to the State's attempt to admit the letter, the judge held an N.J.R.E. 104 hearing. At the hearing, Detective Abromaitis explained the letter was signed by a "D. Smith," yet there was no inmate by that name at the MCACC. Further, the inmate number on the letter was one off from defendant's; the envelope contained defendant's DNA; the letter's contents were consistent with information found on defendant's cellphone, namely, misspelling "cousin" the same way and bearing names also

saved to the phone's contacts; the letter-writer appeared to have knowledge of the crime that was not publicly known; the zip code on the letter was not the zip code of the jail, but a zip code defendant used on other letters; and the handwriting appeared consistent with the handwriting on letters found in defendant's vehicle.

At trial, the State established Booker was familiar with defendant's handwriting. She testified she observed his handwriting on documents when they lived together, and she was able to identify the handwriting from the jailhouse letter as defendant's.

A handwriting expert was not necessary because a jury can compare a sample of a defendant's handwriting with a document purporting to be written by the defendant, without the necessity of expert testimony. State v. Carroll, 256 N.J. Super. 575, 593-98 (App. Div. 1992). Witnesses familiar with the defendant's handwriting may authenticate it. State v. Marroccelli, 448 N.J. Super. 349, 365 (App. Div. 2017). For these reasons, Detective Abromaitis could testify the handwriting on the letter resembled items found in defendant's car, and Booker could authenticate defendant's handwriting given her lengthy relationship with him.

Given the totality of the circumstances, we discern no abuse of discretion in the trial judge's decision to admit the letter into evidence. The State adduced sufficient direct and circumstantial evidence to prove defendant wrote the letter. The probative value of the letter outweighed any prejudice to defendant.

IV.

An issue raised prior to trial involved how best to sanitize the fact defendant was in jail between 2015 and 2017 to prevent the jury from holding defendant's criminality against him. The trial judge's solution was to advise the jury defendant had relocated during this time and returned.

On appeal, defendant argues the sanitization failed. He asserts "the allusions to [defendant] 'going away' and 'coming back' invited prejudicial speculation that [he] was in prison for the domestic abuse of Booker." He asserts the two-year gap between the break-up with Booker in 2015 and his return into her life in 2017 was irrelevant.

This issue was the subject of substantial discussion between the court and counsel. The State sought the judge's guidance on the issue because it was concerned about explaining to the jury why the parties' separation in 2015 was so abrupt. Although the defense disagreed the separation was abrupt, it suggested the judge instruct the jury defendant had moved or was not in the area.

48

The trial judge suggested defendant's absence be sanitized by stating he had "relocated," which "sounds like he moved for business or work as opposed to . . . being forc[ibly] relocated." After some debate between counsel whether the jury should know that defendant was unable to communicate with Booker during his absence, the judge suggested that reference only be made to defendant having temporarily relocated, which could be for many reasons. Both parties accepted the compromise suggested by the judge. Defense counsel commented the compromise was "vague" enough not to draw the jury's suspicions about defendant's absence. The defense requested there be no limiting instruction that could "draw attention" to the issue.

At trial, the reference to defendant's absence by the State was fleeting. Defense counsel objected when the State's questioning of Booker suggested defendant had been involuntarily relocated. The trial judge reminded the State about the discussions surrounding the compromise, and the prosecutor moved on. Defense counsel also objected to a reference during the State's summation that defendant was "coming home" to the extent it suggested "he does not have a home." However, the court overruled the objection, finding that the State's reference was consistent with the pretrial rulings and the testimony about defendant's relocation.

A-5554-18

We are unpersuaded there was an abuse of discretion or any prejudice to defendant. The State never referred to defendant's incarceration, and its fleeting references to his relocation and return did not imply he was incarcerated. The relocation compromise suggested by the trial judge was neutral. Defendant could have relocated and returned for personal, family, or work reasons.

Further, the judge instructed the jury the comments made by counsel were not evidential and the case had to be decided based on the evidence presented. She charged the jury that "speculation, conjecture and other forms of guessing play no role in the performance of [their] duty." The record does not convince us the jury did not follow these instructions.

## V.

On the fourth day of trial, the judge informed counsel "someone from the prosecutor's office observed [juror eleven] consuming a flight of whiskey during the lunch hour one of the days during the trial last week, which is concerning." The judge questioned court officers, but none of them observed any indications the juror was intoxicated.

The judge intended to speak with the juror and advise him not to consume alcohol during the trial, but the prosecutor and defense counsel agreed the better course would be to address the jurors together, rather than single out the juror.

Defense counsel suggested the judge tell the jurors "there was an issue in another courtroom, so we're generally advising everybody" not to consume alcohol during lunch. The defense reasoned this would not leave the jurors to wonder which one of them was drinking at lunch.

The judge agreed to proceed in the manner suggested by defense counsel. Prior to the lunch break the judge advised the jury as follows:

> One of my colleagues reported that a juror involved in one of their cases was consuming alcohol during the lunch hour. And so we're all reminding everyone that that's inappropriate to do during the course of a trial. I presume that no one here would imbibe in that way during the course of the trial, because it could create some challenges with regard to your focus.

Before summations the judge told counsel that at one point during the trial, juror eleven had not looked at evidence as it was passed around. The day before, the juror appeared to have his eyes closed, but the judge did not know if he had fallen asleep. Defense counsel responded: "We're fine if you want to make him an alternate." The State agreed that "if it's between excising and alternate, let's go with an alternate."

Consistent with this plan, juror eleven was made an alternate. Neither he nor the other alternate participated in the deliberations or the verdict.

A trial judge has discretion whether to interview a juror whose conduct is problematic. State v. Mohammed, 226 N.J. 71, 89-90 (2016); State v. Reevey, 159 N.J. Super. 130, 133-34 (App. Div. 1978). Here, the trial judge went beyond questioning the juror and took corrective action by issuing a jury instruction regarding the consumption of alcohol and removing the juror from the deliberations in a non-prejudicial manner.

We discern no error in the way the trial judge handled the problems with juror eleven. Moreover, defendant cannot argue error on appeal when he invited the solutions employed by the judge to deal with the juror at trial. Regardless of whether we consider this to be invited error, there simply was no miscarriage of justice.

VI.

Defendant argues his conviction for unlawful possession of a handgun should be vacated because the State failed to present evidence he did not have a permit to possess a firearm. He asserts the trial judge erred when she failed to grant his motion for acquittal on this charge. Defendant claims we should acquit him on the other convictions as well and grant him a new trial because the verdict was against the weight of the evidence.

The test on a motion for judgment of acquittal is "whether the evidence viewed in its entirety, and giving the State the benefit of all of its favorable testimony and all of the favorable inferences which can reasonably be drawn therefrom, is such that a jury could properly find beyond a reasonable doubt that the defendant was guilty . . . ." State v. D.A., 191 N.J. 158, 163 (2007). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson v. Virginia, 443 U.S. 307, 319 (1979), superseded by statute, Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214. "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution." Ibid.

In reviewing the record, "[n]o distinction is made between direct and circumstantial evidence." State v. Tindell, 417 N.J. Super. 530, 549 (App. Div. 2011). Moreover, "[i]nferences need not be established beyond a reasonable doubt." Ibid. Instead, "a jury may draw an inference from a fact whenever it is more probable than not that the inference is true . . . ." State v. Brown, 80 N.J.

587, 592 (1979). "Nevertheless, the State's right to the benefit of reasonable inferences should not be used to shift or lighten the burden of proof, or become a bootstrap to reduce the State's burden of establishing the essential elements of the offense charged beyond a reasonable doubt." Ibid. On appeal, we apply the same legal standard as the trial court, performing a de novo review of the evidence. State v. Fuqua, 234 N.J. 583, 590 (2018).

Pursuant to these principles, we discern no error in the denial of defendant's motion to acquit on the unlawful possession charge. The trial judge correctly found the State presented enough evidence to allow the jury to infer defendant lacked a gun permit. Likewise, the judge charged the jury it could infer from the facts presented defendant did not have a permit. The record supports defendant's conviction because there was no evidence presented defendant had a permit, thereby allowing an inference that he lacked one.

Although defendant's motion for acquittal focused on the gun charge, the trial judge denied it as to all charges. She found "with regards to the balance of the charges, I think assuming all inferences [in] favor of the State, which is a standard that the [c]ourt has to apply at this point, there is sufficient evidence to give the case to the [j]ury."

The record supports the judge's decision. There was ample evidence to show defendant purposely murdered Olarerin, in violation of N.J.S.A. 2C:11-3(a)(1). The second-degree burglary offense was proved because there was evidence defendant surreptitiously entered Olarerin's home and purposely shot him, in violation of N.J.S.A. 2C:18-2(a)(2) and (b)(1). The second-degree possession of a weapon for an unlawful purpose, in violation of N.J.S.A. 2C:39-4(a)(1), was likewise established by the facts presented.

Based on the substantial evidence presented by the State and according it all favorable inferences, it is clear the jury could find beyond a reasonable doubt that defendant was guilty of the offenses charged. For these reasons, the trial judge properly denied a judgment of acquittal.

Defendant did not move for a new trial. Regardless, a new trial may be granted where "it clearly appears that there was a miscarriage of justice under the law." State v. Smith, 262 N.J. Super. 487, 511-12 (App. Div. 1993) (internal quotation marks omitted). A new trial should not be granted "unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law." R. 3:20-1. Our review of the record does not convince

us there was either a miscarriage of justice or a manifest denial of justice warranting a new trial.

## VII.

Finally, defendant argues his "sentence was manifestly excessive because the trial court based the sentence on pending criminal charges as well as double-counting aggravating factors." He asserts he was punished with a sentence that is tantamount to life imprisonment because he declined to plead guilty and instead proceeded to trial.

The trial judge found the following aggravating factors: three, the risk defendant would commit another crime, N.J.S.A. 2C:44-1(a)(3); six, defendant's prior criminal record, N.J.S.A. 2C:44-1(a)(6); and nine, the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9). She concluded the aggravating factors substantially outweighed the non-existent mitigating factors.

The trial judge noted this was defendant's sixth conviction, and recited his prior convictions, which included aggravated assault on a law enforcement officer, escape, and armed robbery. Defendant had three pending charges— including certain persons, stalking, and filing a false report offenses—all of which arose from the investigation and prosecution of the present charges. The

56

judge also recounted defendant's municipal convictions, a domestic violence FRO issued against him, and his juvenile adjudications.

The judge gave all the aggravating factors "great weight." As to aggravating factor three, she found "there is a very strong risk that this defendant will commit another crime." She noted: defendant had "led a life of crime . . . first as a juvenile offender, and continuing throughout his adult life"; he showed "no signs of remorse," and "[o]nly an attitude of someone who fails to accept the fault for taking another human life"; he "acted with clear premeditation demonstrating that he is a cold[-]blooded killer and has complete disregard for the value of another human life"; and "committed this crime in violation of a domestic violence [TRO], demonstrating once again that he has absolutely no respect for the law . . . ."

The judge found aggravating factor six applied "not only due to the extent of his prior criminal history," but because defendant committed the murder and other offenses while on bail, awaiting sentencing for second-degree robbery. She noted defendant was charged with a new offense, the false reporting of a crime, while incarcerated in advance of trial, but did not consider it as part of the sentencing because defendant enjoyed the presumption of innocence.

The judge found aggravating factor nine because "[i]t seems that the only way to deter . . . defendant from committing crimes is to keep him in jail." She noted defendant was undeterred by Booker's attempts to dissociate from him, the TRO she obtained, or his prior convictions. The judge concluded "the kind of ethical consci[ence] that pr[e]vents good and law[-]abiding people from committing the irreparable and dreadful act of killing another human being does not exist in [defendant]." And "[a]s for general deterrence, the public needs to know that there are consequences for taking another life, and those consequences are substantial."

The judge rejected defendant's argument for mitigating factor eight, that the circumstances of his offense were unique and unlikely to recur, N.J.S.A. 2C:44-1(b)(8). She found "the severe nature of this crime, and . . . defendant's complete and utter disregard for the law and the value of a human life, [convinced her] the obsessive and evil nature of his behavior still lurks beneath the surface based upon his outward demeanor and his continued denials."

Defendant argued for mitigating factor eleven, that imprisonment would entail excessive hardship, N.J.S.A. 2C:44-1(b)(11), because he was in a wheelchair and "[b]eing medically fragile in the prison system . . . put him at higher risk than other people who are incarcerated." The State argued defendant

58

was attempting to manipulate the system by claiming he had back problems, even though in the presentence report, defendant reported good physical and mental health. The judge rejected this mitigating factor because defendant reported good health and could receive medical treatment, including back surgery, in prison.

Defendant also argued for mitigating factor twelve, defendant's willingness to cooperate with law enforcement authorities, N.J.S.A. 2C:44-1(b)(12). Apparently, defendant had offered to cooperate in a separate matter in Essex County. The judge stated: "I think that the [c]ourt is aware of those facts, to the extent that they are applicable here," and offered to hear them at sidebar. Although the sentencing transcript notes the discussion was indiscernible, the record shows defense counsel conceded the applicability of mitigating factor twelve was questionable. The State noted it had spoken to its counterpart in Essex County, and defendant's information had not been of use. The judge rejected mitigating factor twelve.

Defendant argued the court should impose a thirty-year sentence in accordance with the State's pretrial offer. The judge declined, noting she was not bound by the offer and had to sentence defendant in accordance with the law. She concluded "it is clear that the minimum sentence of [thirty] years is

completely inappropriate, because of the substantial outweighing of the aggravating factors."

Sentencing decisions are discretionary in nature.  State v. Cuff, 239 N.J. 321, 347 (2019).  Therefore, we review them for an abuse of discretion.  State v. Jones, 232 N.J. 308, 318 (2018).  We defer to the sentencing court's factual findings and should not "second-guess" them.  State v. Case, 220 N.J. 49, 65 (2014).

"To facilitate meaningful appellate review, trial judges must explain how they arrived at a particular sentence."  Id. at 65.  We will reverse a sentence where:  the findings of fact on the aggravating and mitigating factors were not based on competent and credible evidence in the record; the court incorrectly applied the sentencing guidelines enunciated in the criminal code; and the application of the facts to the law constituted such an error of judgment as to shock the judicial conscience.  State v. Roth, 95 N.J. 334, 363-65 (1984).

Pursuant to these principles, we discern no error in the trial judge's consideration of the aggravating factors and mitigating factors.  The judge did not double-count the elements of the murder offense by noting that defendant's crimes were premeditated when she was considering aggravating factor three.  An "emotional murder" and a "cold[-]blooded killing," constitute purposeful

murder under the statute.  See N.J.S.A. 2C:11-3(a)(1).  See also State v. Gerald, 113 N.J. 40, 149 (1988) (rejecting "homogeniz[ing] distinctly different states of criminal culpability").  Defendant's conduct was clearly purposeful.  The trial judge appropriately considered defendant's risk of committing another offense when she noted the distinction between "emotional murder" and a "cold[-]blooded killing."  His remaining arguments concerning the aggravating and mitigating factors, and the sentencing in general, lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed in A-5554-18 and in A-3894-19.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION